## No. 7687.

### W. S. BEERS vs. THE BOARD OF HEALTH ET ALS.

The law is not, if a party threatens another with the commission of a wrong, unless he does an act which he is not obliged to do, that such party has a right to commit the wrong, and that the injured party cannot recover damages.

The authorities agree that, after a wrong has been committed, the damaged party shall not increase it, and that, if he does, he shall have no right to complain for loss or injury sustained in consequence of his wilful acts of commission or omission.

Damages can be recovered from an officer, although apparently acting in the discharge of official functions, for the execution of an order of his, which was unauthorized, arbitrary and wrongful.

The President of a Board of Health, ordering the fumigation of a vessel carrying a cargo of fruit, is personally answerable in damages where he thus acts under his declared personal responsibility, without authority from law or the Board, and arbitrarily; and where the cargo was in consequence damaged.

Where witnesses, who belong to the same trade and business, testify as to the value of articles within their line, the safe rule is to allow the lowest estimate.

APPEAL from the Sixth District Court, for the Parish of Orleans. *Righter, J.*

*Geo. L. Bright* for Plaintiff and Appellee.

*Breaux & Hall* for the Public Administrator, on the same side.

*F. C. Zacharie* and *T. H. Kennedy* for Defendants and Appellees.

The opinion of the Court was delivered by

MANNING, J.   The plaintiff sues the Board of Health, and the individual members thereof, to recover $3,598 as damages for injury to a cargo of fruit caused by fumigating the vessel at the quarantine station.

The schooner came from Port Antonio, Jamaica, where she took in this cargo of bananas in March, 1878, and arrived at the quarantine station April 3d.   There was no yellow fever at that Port when she left, and no disease of any kind on the schooner then, or during the voyage, or at her arrival.   The master of the schooner had a clear bill of health.   The Governor had not issued his proclamation declaring any place infected.   Yellow fever has never prevailed at Port Antonio. One case only is reported there, brought from elsewhere.

On the arrival of the schooner at the quarantine station the resident physician telegraphed the President of the Board of Health for instructions.   It seems he was already under orders to fumigate vessels, since he stated to the President that the master insisted that fumigation would ruin his cargo, burning sulphur being the article used.   Dr. Choppin telegraphed in reply ordering the fumigation, adding " fumes of sulphur do not ·injure fruit.   Put carbolic acid carefully in bilge, but do not sprinkle it over fruit."

This order was obeyed, and the fruit was blackened.   The cargo, valued at $4,375, sold for $839.50

The order was made by the President of the Board without its sanction, though his action was afterwards approved by the Board, one member only dissenting, and the plaintiff contends that this makes it the act of the Board, for the consequences of which the Board and each member thereof is responsible.

We do not think this sanction of the Board retroacts, and makes them responsible for the trespass of the President.   The illegal act, if it were illegal, had been already committed, and they did not make themselves co-trespassers by a subsequent approval of it.

The defendant contends that the act was not illegal, but on the contrary was authorized under the power conferred specially upon the Board by the Act of 1876, whereby authority is given it to " disinfect, fumigate, and purify any vessel from ports in which yellow fever usually prevails, or from ports where other contagious or infectious diseases are reported to exist."   Sess. Acts, p. 110.   The hindrance to the

application of this law is the absence of that condition, the existence of which must form the basis and the justification of the Board's action. Yellow fever does not usually prevail in this Port Antonio, and no other contagious or infectious diseases were reported to exist there.

The power must therefore be derived from some other source, and we can find none unless it be in that clause of the law reorganizing the Board of Health, which authorizes it to establish quarantine stations upon any of the approaches to New Orleans, whenever in its discretion they may be necessary to protect the health of the City or the State, and to make all needful regulations for the management and police of these stations, and also provides a penalty for any master of a vessel who shall refuse to allow the quarantine officer to disinfect or fumigate his vessel. Sess. Acts 1877, Sec. 7, p. 119.

The Board had authorized its President to act in cases of emergency, and to report his action to the Board when it met. Under that authorization the President ordered the fumigation of this vessel without consulting the Board, and his action as already stated was approved. The physicians who were examined as witnesses say that yellow fever is endemic in the West India Islands, and that Jamaica is in the yellow fever zone, that is, that it is likely to appear there at any time, but there seems to be no doubt that it was not there when this schooner left. Certainly it was not at Port Antonio.

It looks like an arbitrary act to have ordered the fumigation of a vessel with a clear bill of health, coming from a port where there was and had been no sickness, before the proclamation of any port whatever as infected, and with a cargo, the marketable value of which would be destroyed by fumigation. Ignorance of the fact that it would destroy the cargo does not excuse the act, and although we feel that considerations of public policy are entitled to great weight, and the need to uphold the authorities in efforts to secure the public health presses with peculiar force upon us here, we should not be inclined to disallow a claim for damages so well founded as this is, had not the plaintiff refused to do or permit to be done what would have saved his cargo.

The health officer, on receiving Dr. Choppin's order to fumigate the schooner, suggested to the master to unload his cargo on the customhouse wharf at the quarantine station, and offered assistance to help the crew unload. This was done because the master persisted in saying that the fruit would be ruined, and an opportunity was thus given him to avoid the injury and loss which he apprehended. He asked who would pay for this unloading, and on being told he must pay the expense refused to do it, although he was convinced the fumi-

gation would destroy the saleable quality of his cargo. There were 1,750 bunches of bananas. What time it would have taken to unload, fumigate the vessel, and reload does not appear. The actual detention was a little over six hours. The expense could not have been very considerable, but whether little or much, could have been preferred as a claim for reimbursement.

The plaintiff resists this conclusion, arguing that it was rather the duty of the defendant to cease the continuance of his wrongs than the plaintiff's to give up acknowledged rights, citing Sutherland to that effect, and a Statute of Congress forbidding under penalty any vessel unloading before coming to the place for the discharge of cargo.

The Act of Congress might as well be held to apply to the partial discharge of cargo to lighten the ship at sea in a storm, as to a discharge for disinfection under quarantine or health laws, and the author cited continues the quotation from the Michigan Court in this wise:

"If a man tortiously injure the roof of my dwelling, and I obstinately leave it in that condition, and having the opportunity, refuse or neglect to repair, until the furniture and bedding in the house are injured or destroyed by the rains, I cannot recover of him for this injury to my furniture and bedding, which I might have avoided by timely repairs. And if a man comes to my field where my cattle are grazing and turn them out into the street and turn his own cattle in, thus ousting me from the possession, and claiming and holding exclusive possession against me, I cannot leave my cattle to starve on the street and charge him with their full value; * * * but I can recover only such damages as I have suffered, beyond what I might have avoided, by reasonable diligence."

The principle which we here apply is stated succinctly by the same author thus:

"If the plaintiff omit to use his opportunities and does not reasonably exert himself to lessen the damages, which may result from the defendant's act, he is not entitled to compensation for the injury which he might and ought to have prevented, except to the extent of proper compensation for such measures or acts of prevention as the case required and were within his knowledge and power." 2 Sutherland on Damages, 238. See also Levy vs. Car. Canal Co., 34 An. 180; Tardos vs. Jackson R. R. Co., not yet reported.

Judgment affirmed.

---

### DISSENTING OPINION.

POCHÉ, J. The majority opinion in this case concedes to plaintiff all the facts which should have dictated a judgment in his favor.

The propositions of law which he advances in support of his demand are also sustained in a great measure.

The Court finds that the act of Dr. Choppin, in ordering the fumigation of the vessel, was not sanctioned by law, was not authorized by the Board of Health, and was not justifiable either by reason or justice. And yet the plaintiff is denied the just relief to which he is manifestly entitled, because he refused to tamely submit to a wrong for the purpose of avoiding a greater wrong. As it is conceded that the President of the Board exercised a power not vested in him by law, his liability must be tested by the same rule which would apply to a private citizen, who would have arbitrarily invaded the sacred rights of another.

Now, if the captain of this vessel had been overpowered by an armed body of men, who would have insisted on fumigating his vessel at the risk of damaging his cargo, and he had declined their proffered liberality of allowing him the time to unload and reload his merchandise, would his refusal be entertained for a moment as a proper defence in an action for damages against the wrong-doers? Evidently not.

I see no possible difference between such a case and the circumstances of this case, in which the conduct of the President of the Board is avowedly unjustifiable, unlawful and arbitrary.

The following principle enunciated by the Supreme Court of Michigan has a peculiar application to the present case, and should, in my opinion, have been applied in justification of the captain's refusal to unload his vessel:

" As to the question of duty, as well might it be said, if he had repeatedly assaulted and beaten me and my family, in my own house, and declared his intention of repeating the process as long as we should remain there, it would be my duty to remove myself and family from the house to avoid increasing the damage which might otherwise accrue from his further continuance or repetition of the like conduct."

I agree with my Associates in their conclusion exonerating the Board and its other members from responsibility in the premises, but in my opinion the President of the Board was undoubtedly responsible for all the damages suffered by plaintiff, who, like many other men engaged in commerce, will see very little encouragement to bring his vessels and cargoes to a port where he finds such little protection for his property and his sacred rights.

I, therefore, dissent from the decree rendered in the case.

Mr. Justice Todd concurs in this opinion.

## CONCURRING OPINION.

FENNER, J.　If the action of Choppin had been clearly wanton and arbitrary, I should doubt the applicability of the principle that plaintiff should lose his damages because he did not do what was possible to avert or lessen them.　But Choppin's action was not of the character indicated, but was doubtless taken in the conscientious discharge of what he believed to be a grave public duty.　Although the evidence taken after the fact, perhaps, establishes that Port Antonio was not infected with yellow fever, or usually subject thereto within the terms of the law, it is not to be forgotten that it lies within that extensive *nidus* of the disease which is professionally known as the yellow fever zone, in which, as a general rule, yellow fever is endemic.　The exemption of this particular obscure port was an exceptional fact, of which Choppin was not bound or presumed to be aware.　Nor was he bound to accept the mere assurance, to that effect, of interested parties, whose misrepresentation might expose an immense population to the calamities of pestilence.

Plaintiff had no reason to doubt that the health authorities, who were without private interest, were acting in good faith; and it was his duty to have done what lay within his power to avert damage, when offered the opportunity to do so.

I, therefore, concur in the decree herein.

## ON REHEARING.

BERMUDEZ, C. J.　The argument on the rehearing has failed to demonstrate that the Court erred in exculpating the members of the Board from the responsibility which was sought to be fastened upon them.

A review of the evidence shows that the Court had not misunderstood the facts, and that the same were correctly stated.

A reconsideration of the perplexing legal questions involved, having a bearing on this case, has, however, established that the plaintiff cannot be considered as having been in fault, as was first found, and that he was not, therefore, properly chargeable with contributory negligence in refusing to unload the fruit cargo, illegally ordered to be fumigated by the President of the Board of Health in his individual recognized responsibility.

The testimony shows that he refused to unload and declined to pay for the unloading, but it does not establish that he objected to its being done.　After the fumigation, against which the plaintiff had entered a formal protest, had taken place, he did everything in his

143

power to prevent an aggravation of the wrong inflicted upon him, by endeavoring to realize for the damaged cargo as much as possible under the pressing circumstances of the time.

It is worthy of note, that when plaintiff's agent called on the President of the Board to prevent the fumigation, that officer remained deaf to the protest, and persisted in the execution of his instructions to the quarantine agents, saying that he was responsible for the act.

It is also to be observed that whatever may have been the authority of the President of the Board to cause vessels to be fumigated, there has been offered no justification for the fumigation of that portion of the craft in which the fruit had been stored—a thing, one of the witnesses says, which had never been heard of previously.

The authorities do not go to the length, nor could they, of saying that, if a party threatens another with the commission of a wrong, unless he do a certain act which he is not obliged to do, such party has a right to commit the wrong, and the damaged party cannot recover.

The authorities all concur in establishing the proposition that, after a wrong has been committed, the damaged party shall not increase it, and that if he do, he shall have no right to complain for loss or injury sustained in consequence of his wilful acts of commission or omission. Sedgwick, 7th ed., p. 170; 54 N. Y. 528; 43 Me. 578; 38 Iowa, 522; 45 Md. 136; 17 Pick. 284; 1 Md. 329.

Liability attaches in such a case as this, as the act done, and which occasioned the loss, was unauthorized, arbitrary and wrongful.

The testimony shows that there were 1,750 bunches of bananas of a superior quality on board the vessel, and in excellent condition when it reached the quarantine; that there was a scarcity of such fruit on the market where it was in demand, and that, had the cargo not been fumigated and consequently damaged, it would, on its arrival here, have realized quite a high price, some witnesses say as high as $3 a bunch. In cases of this description, however, it is not safe to accept blindly the highest estimate of witnesses belonging to the same trade or business, for there exists among them a certain *esprit de corps* which has to be guarded against, and which materially reflects upon and affects their evaluation. The safe rule in such cases is to adopt the lowest estimate. The testimony also shows that in ordinary times a bunch of bananas realizes a dollar; but, that at the particular date of the arrival of the cargo, in this case, in New Orleans, the fruit would have realized $1.75 per bunch, if sound.

At that price the proceeds of sale would have amounted to $3,062.50 deducting therefrom $849.50 which the cargo brought, there remains a

balance of $2,223, which the plaintiff is entitled to recover as damages, but without interest.

It is, therefore, ordered that the previous decree herein made be annulled and set aside, so far as it affirms the judgment appealed from, in favor of S. Choppin, and it is now ordered and adjudged that the judgment appealed from, in so far as rendered in favor of Samuel Choppin, be and it is now reversed and avoided.

And it is now ordered and adjudged that the succession of William S. Beers do have and recover from the succession of Samuel Choppin, or its legal representatives, his widow in community and heirs, in the proportion fixed by law, half from the former and half jointly from the latter, each for his virile share, the sum of two thousand two hundred and twenty-three dollars ($2,223) without interest, and the costs in both Courts.

It is further ordered and adjudged that, in other respects, the previous decree herein remain undisturbed, and accordingly, that the judgment of the lower court, in favor of the other defendant, be affirmed at the cost of the cast defendant and his succession.

Mr. Justice Fenner and Mr. Justice Manning adhere to the original decree.