(35 South. 610.)

No. 14,833.

## SOUTHERN COTTON OIL CO. v. SHREVE-PORT COTTON OIL CO.*

(Dec. 14, 1903.)

### SALE—AUTHORITY OF BROKER—SECRET INSTRUCTIONS.

1. A broker exhibited to plaintiffs a telegram from defendants expressly authorizing him to sell for them 10 tanks of oil of a certain grade, and plaintiffs in good faith bought the oil. Defendants claim that before sending the telegram they had expressly instructed the broker to sell oil of a lower grade than that specified in the telegram. *Held* that, in dealing with the broker, plaintiff did not have to look beyond the telegram; that defendants, having held out the broker as having authority to make the sale, are bound by his act, notwithstanding any secret instructions they may have given him.

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Alfred Dillingham Land, Judge.

Action by the Southern Cotton Oil Company against the Shreveport Cotton Oil Company. Judgment for defendants, and plaintiffs appeal. Reversed.

Thatcher & Welsh and Sterling Pierson, for appellants. Thigpen & Foster, for appellees.

PROVOSTY, J. Battle & Co., brokers at Memphis, Tenn., sold to the plaintiffs, the Southern Oil Company, of Memphis, Tenn., 10 tanks of cotton seed oil for account of the defendants, the Shreveport Cotton Oil Company, who are manufacturers of cotton seed oil at Shreveport, La. Plaintiffs understood they were buying the grade of oil known as "crude," or "prime crude," which is a standard grade of oil; and defendants contend that Battle & Co. had no authority from them to sell that grade of oil, but only "season's prime," and that in consequence there was no contract. "Season's prime" is not a classification known in the exchanges of the country. Plaintiffs bring this suit for breach of the contract, claiming by way of damages the difference between the contract price and the market price at the date when delivery should have been made under the contract.

---

*Rehearing denied January 18, 1904.

The questions in the case are, first, whether Battle & Co. had authority to sell "crude" oil; and, if not, then, second, whether defendants are not bound nevertheless, on the ground that they held out Battle & Co. as having such authority.

The sale to plaintiffs was made some time in the morning of November 9th. The relations between Battle & Co. and defendants began, so far as the record shows, on November 5th. On that day the following communication passed between the parties: Battle & Co. telegraphed defendants: "What is bottom price ten tanks prime November?" And defendants promptly answered: "Sell ten November buyers tanks crude 28." During the day Battle & Co. wrote defendants, as follows:

"We confirm our telegram to-day soliciting your lowest price on ten tanks of oil, and we have your reply authorizing us to sell at 28. We thank you very much for your prompt attention and beg to say we are exerting ourselves to put this trade through for you. However, we think it very improbable that any buyers in the market will pay 28 cents to-day for Miss. Valley oil. Some buyers are offering 26½ and very few of them will pay as much as 27c. We have out several telegrams and just as soon as we can ascertain definitely the very best that can be done, we will either telegraph or call you over the telephone."

And defendants wrote to Battle & Co., as follows:

"Your telegram of to-day reading as follows: 'What is bottom price ten tanks prime November?' We presume of course you refer to crude oil. We wired you immediately: 'Sell ten November buyers tanks crude 28,' all of which we confirm, at this writing we have not heard from you, therefore presume you are not desirous of taking the oil at this price, we will let others work on the same offer."

At 6:47 p. m., while the above letters were in transit, Battle & Co. sent the defendants the following telegram: "Have tried hard to close but 28 impossible. Possibly can secure 27½ but 27 best offering."

And defendants answered: "If 28 impossible sell ten November December buyers tanks."

Still later in the day, Battle & Co. telegraphed: "Market very weak buyers not offering have firm offer 27 for five tanks December prime crude. Shall we confirm. Answer immediately."

Nothing further, apparently, took place on the 5th. On the 6th, presumably early in the day, defendants wrote to Battle & Co. as follows:

"We received your wire late last evening advising that '28 impossible possibly can secure 27½, but 27 is best offer.' We immediately telephoned a message to the telegraph office instructing to sell ten tanks December, January crude 27½ if 28 is impossible, not hearing from you we presume you are not able to make sale."

On the same day, the 6th, and therefore while the above letter was in transit, W. P. Battle, of Battle & Co., and S. J. Harmon, manager of the defendant company, had a conversation over the telephone. In this conversation W. P. Battle informed S. J. Harmon that the party willing to buy at 27 cents was Procter & Gamble, of Cincinnati, Ohio; and S. J. Harmon informed Battle that Procter & Gamble were personæ non gratæ to defendants, and that on that account defendants were not willing to deal with them on the basis of "crude," and would do so only on the basis of "season's prime." Later in the day Battle & Co. sent defendants the following telegram: "Procter will only confirm as prime crude their routing. Better let us close as refined markets are weaker. Please wire answer immediately."

On the same day defendants answered by the following letter:

"We are just in receipt of your message advising that Procter and Gamble will only confirm for prime crude. We are not desirous of selling any more oil, therefore we are answering your message, having sold pretty well against seed that we will get for this season our run will no doubt be a short one."

Also on the same day, and while the above letter was in transit. Battle & Co. wrote as follows:

"We beg to confirm interchange of telegrams yesterday and to-day relative to ten tanks of oil.

"We also confirm conversation with your Mr. Harmon over the telephone to-day, as stated we could sell Procter & Gamble five tanks of December at 27 for prime crude, and after talking with you over the telephone, we confirmed the transaction to them, subject of course to their acceptance, as season's prime Cotton Belt routing. We are in receipt of their reply, in which they state that it is impossible to confirm that way, and they say that they can only accept, provided we sell as prime oil and their routing. We have just telegraphed you this fact, and now await your reply.

"We regret very much indeed that we are not able to come to business with you on the original ten tanks. At any rate we thank you for the opportunity you have given us to trade and we trust conditions will warrant you in accepting the five tanks."

All this was on the 6th. On the next day, the 7th, on receipt of the above letter of defendants advising that the 10 tanks of oil had been sold to other parties, and that the further product of the season had been sold, Battle & Co. wrote as follows:

"We have your favors of the 5th and 6th. We are very sorry indeed that we failed to come to business with you yesterday, but we could not get our buyer to confirm season's prime, Cotton Belt routing. We can use oil provided you can sell as prime crude, buyers routing.

"The market seems practically unchanged with a good many of the buyers holding off. We trust that we may yet be able to come to business with you and will be very glad indeed to have you advise us when you offer more oil."

Before receiving this letter, and while, therefore, they were unadvised as to whether their letter of the 6th revoking the authority to sell had reached Battle & Co. in time to prevent a sale, defendants, at 5:36 p. m. of the 7th, telegraphed to Battle & Co. as follows: "If unsold will sell ten buyers tanks December January crude 27." And on the next day, the 8th, they wrote to Battle & Co. as follows:

"We wired you yesterday evening, as follows: 'If unsold will sell ten buyers tanks December January crude 27' which we now confirm and await your reply."

On the same day, the 8th, after receiving Battle & Co.'s letter of the 6th, they wrote as follows:

"We have yours of the 6th. We are sorry that you could not trade with Procter & Gamble at 27, we have disposed of this shipment of oil at the price and now offering ten additional tanks. We wired you to this effect late yesterday evening and trust you will be able to place same."

This was a renewal of the commission to sell 10 tanks of oil of the "crude grade." Acting under it, Battle & Co. sought for a purchaser, and, finding that plaintiffs were willing to buy if a firm offer were made, W. P. Battle at 5:15 of the same day, the 8th, called up S. J. Harmon, defendants' manager, over the telephone, and a conversation ensued. As to the purport of this conversation the parties differ. Defendants contend that S. J. Harmon distinctly and expressly instructed Battle & Co. that the grade of oil they were authorized to sell was season's prime. W. P. Battle denies on the witness stand that any such modification of the commission took place. In this denial Battle is alone, while Harmon is corroborated by two witnesses who say they were at his side while he was telephoning, and heard what he said. But Battle is corroborated by the telegram sent by defendants a few hours later, and which, in the same conversation, it had been agreed should be sent. This telegram reads as follows: "Accept 27 ten December January buyers tanks crude f. o. b." Five minutes later, at 8:45 (before having received this telegram, however), Battle & Co. sent defendants the following message: "Am offered firm 27 ten tanks prime crude December January buyers tanks. Better let us confirm quick."

On the morning of the 9th, Battle & Co. showed to plaintiffs the above telegram received by them from defendants, reading, "Accept 27 ten December January buyers tanks crude f. o. b.," and on the strength of it sold to plaintiffs the 10 tanks at 27 cents, deliverable in the course of December and January following, and at once advised defendants of the sale by telegraph.

Defendants did not answer by telegraph, but by mail. Some time in the forenoon on the 9th they wrote Battle & Co. as follows:

"I wired you late last evening 'Accept 27c. ten December January buyers tanks crude f. o. b.,' and received this morning your message sent last night 'Am offered firm 27c. ten tanks prime crude December January tanks, better let us confirm quick.' You will understand from this we consider sold by you ten December January tanks of season's prime crude at 27 cents, and will ask you to route by Cotton Belt, and of course your buyer will be to our confirmation, as we do not care to sell to Procter & Gamble."

On the day this letter was written, but at what time of the day is not shown, the market price of oil rose half a cent, and thereafter it kept on rising; and the parties, in their correspondence, kept insisting the one that crude oil had been bought, and the other that what had been sold was season's prime, as Battle & Co. had no authority to sell any other. When the last day had expired for the delivery of the oil, plaintiffs brought this suit to recover the difference between the price fixed in the contract and the market price; the price of oil having in the meantime risen to 35 cents.

Under these facts, defendants are liable. The telegram of the 8th, "Accept 27 ten December January buyers tanks crude f. o. b.," was express authority to sell crude, and plaintiffs in good faith acted on that telegram. It can make no difference what instructions were given over the telephone. One dealing with an agent "need not, in search of his powers and their limitations, look beyond the instrument of mandate." Brown v. Frantum, 6 La. 39. Whatever private instructions defendants may have given to Battle & Co., they certainly by this telegram held their said agents out as having authority to sell crude oil; and, as against buyers in good faith—and plaintiffs were such—they are concluded. The authorities are agreed on the point that the principal "is bound equally by the authority which he actually gives, and by that which by his own acts he appears to give." Lister v. Allen, 31 Md. 543, 100 Am. Dec. 78; Carmichael v. Buck, 70 Am. Dec. 226; McAlpin v. Ziller, 17 Tex. 508; Howell v. Graff, 25 Neb. 130, 41 N. W. 142; Brown v. Frantum, supra.

On the question of whether, in this transaction, Battle & Co. were the agents of plaintiffs or of defendants, the record leaves no room whatever for doubt. When Battle & Co. originally, on the 5th of November, solicited employment of defendants to sell 10 tanks of

oil, they were not acting for plaintiffs or for any one in particular. They were simply brokers seeking employment. After defendants had given them the commission, they exerted themselves to find a purchaser, and did find one, in the firm of Procter & Gamble. The deal with Procter & Gamble fell through, and defendants withdrew the commission altogether, saying that they had disposed of the oil elsewhere. Thereafter, in the afternoon of the 7th, without any solicitation from Battle & Co., they again gave the latter a commission to sell 10 tanks of oil. This was not the same oil which had been offered to Procter & Gamble, but was "ten additional tanks." In their letter of the 8th they refer to this telegram of the afternoon of the 7th as follows: "We are sorry that you could not trade with Procter & Gamble at 27, we have disposed of this shipment of oil at that price and now offering ten additional tanks. We wired you to this effect late yesterday evening and trust you will be able to place same." This was a new commission, unsolicited by Battle & Co. It was not a proposition by Battle & Co. to defendants to buy oil for somebody, but was purely and simply a commission by defendants to Battle & Co. "to place" 10 tanks of crude oil at 27 cents for them. Acting under this commission, Battle & Co. sought out plaintiffs and offered them the oil; and, after securing from them an assurance that a firm offer at 27 cents would probably be accepted, they at 8:45 sent the message: "Am offered firm 27 ten tanks prime crude December January buyers tanks. Better let us confirm quick." They had not yet received the message which defendants had sent them five minutes previously: "Accept 27 ten December January buyers tanks crude f. o. b." When they received this message, which was exactly and precisely responsive to the one they themselves had just sent, they considered themselves authorized to make the sale to plaintiffs, and accordingly did so the next morning. These are the facts, and they refute completely the contention that Battle & Co. were not the agents of defendants in this transaction, but were the agents of plaintiffs. "A broker is the agent of him who employs him first, and only becomes the agent of the other when the agreement is

definitely settled." 4 Am. & Eng. Ency. of Law (2d Ed.) p. 966; Wood v. Rocchi, 32 La. Ann. 210.

Under this view of the case, it is unnecessary to go into any lengthy examination and analysis of the evidence in connection with the point whether, in the conversation over the telephone in the afternoon of the 8th, the authority of Battle & Co. was restricted to season's prime. But on this point, likewise, the case is with the plaintiffs. It would be passing strange if in this one conversation over the telephone defendants had thus carefully restricted the authority of the broker to season's prime, when, in all their written communications, telegrams, and letters, they had expressly specified "crude." The very telegram confirmatory of the telephone conversation specifies "crude." Defendants knew the difference between the two grades of oil as well then as they do now. True, in the deal with Procter & Gamble they did refuse to sell crude, and insisted upon season's prime; but this was because Procter & Gamble were objectionable to them, and they did not care to deal with them. This is fully testified to by W. P. Battle, and is not contradicted, and is further shown by the following passage in their letter of the 9th: "Of course your buyer will be of our confirmation, as we do not care to sell to Procter & Gamble."

Another strange circumstance is that although the correspondence had theretofore been by telegraph and telephone, confirmed subsequently by letter, defendants did not answer by wire the announcement of the sale to plaintiffs, but by mail. The telegram announcing the consummation of the sale reached them on the morning of the 9th. They answered by letter. And even then they did not repudiate the transaction, but only said: "You will understand we consider sold by you ten December January tanks of season's prime at 27 cents." How could they consider season's prime to have been sold, when their instructions were to sell crude, and the telegram announcing the consummation of the deal told them that what had been sold was "crude"?

Plaintiffs are entitled to recover. As to the amount they are entitled to, there is no dispute. "In an action against the seller for not delivering the goods, the measure of

damages, the price remaining unpaid, is the difference between the contract price and the market value at the time appointed for the delivery." Thompson v. Howes, 14 La. Ann. 45.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the defendants be condemned to pay to the plaintiffs the sum of $4,062.50, with legal interest from this date, and that the defendants pay the costs of both courts.