No. 23,887.

ELIZABETH G. MOODY, *Appellee*, v. E. C. WICKERSHAM, *Appellant*.

SYLLABUS BY THE COURT.

1. ACTION—*Damages for Inhumane Treatment of Smallpox Patient—Amended Petitions—Statute of Limitations.* The second amended petition, filed in time, made the defendant a party and charged him substantially as the third amended petition did. *Held,* that although such third amended petition was not filed till more than two years after the injury complained of, it was a mere elimination of other parties defendant and did not materially change the charge against the remaining defendant, and hence the action was not barred.

2. SAME—*Inhumane Treatment of Smallpox Patient by Health Officer—Personal Liability for Damages.* The defendant, a local health officer, in quarantining a patient whom a physician had pronounced suffering from small-

Moody v. Wickersham.

pox was acting in a ministerial and not a judicial or quasi-judicial capacity, and was liable for damages caused such patient by his treatment.

3. SAME—*No Error in Record of Trial.* The record furnishes no showing of material error touching instructions refused or given, in the conduct of the court, or in reaching the verdict.

4. SAME—*Actual Damages Shown—Punitive Damages Recoverable.* Actual damages were shown and punitive damages were properly awarded.

5. SAME—*Quarantining Patients—Duty of Public Officers.* Health officers in quarantining patients in time of smallpox or other epidemics, must act in a reasonably humane and considerate manner.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed July 8, 1922. Affirmed.

*E. D. McKeever,* of Topeka, *Thomas E. Wagstaff,* and *Chester Stevens,* both of Independence, for the appellant.

*A. R. Lamb* and *Clement A. Reed,* both of Coffeyville, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff was a housekeeper for the Carl Leon Hotel in Independence, Kan. Prior to February 14, 1918, she had been sick, and on the 13th she began to break out, and on the morning of the 14th the manager said she had better call a physician. Doctor Aldrich was called and pronounced the case smallpox and said he would have to see the health officer, and sent for or called the defendant, Doctor Wickersham, secretary of the board of health and acting health officer.

The plaintiff's story, in brief, was that Doctor Wickersham came to the hotel and took her away, giving her no reason, but said he would give her fifteen minutes in which to get ready. He took her in an open car on a very cold day, and in passing through the cemetery, he said: "You had better pick you a headstone, cause here's where I'm going to take you next." He stopped at the door of a small cabin:

"I stepped up to the door and there sat this stranger in the room; I just felt I couldn't go in. I said to Doctor Wickersham, 'You can't leave me here. I just couldn't stay.' The condition of the house was dirty and nasty, and I told him I couldn't sleep in those beds; that they were too dirty. The beds were so dirty that they were blue."

He told her she could clean it up if she wanted to, but she had nothing to clean with; there was a box for a table off which they ate dinner; a little coal stove to cook on and two beds in the one-

room shanty, sitting end to end. The house was boarded up and down and no paper on the walls; the windows were small.

"We put quilts up around the bed to keep the wind out because the boards did not fit together and there were cracks. The wind was awful cold, and we burned coal. The floor was a naked floor, made out of big boards and there was no foundation under the house."

A very unkempt man, weighing about 180 pounds, was in charge of the shanty, and with this man the plaintiff was left alone.

"There were no conveniences to answer the calls of nature. The man went out. Of course I worried, and fretted and that night I had a high fever and I wasn't up much. The man carried the slop jar out for me."

When the plaintiff told the doctor she was afraid she would catch cold as she was used to steam heat, he turned to the man and told him that she had come from the hotel where she expected it to be a hundred. There were no screens or curtains between the beds, and there the plaintiff was left, and at night a nurse came and took care of her until she was removed.

"I suffered very severely with the cold. Doctor Wickersham never talked kind to me while I was there. He spoke harsh. He talked gruff and short."

"The nurse turned the pillow slip wrong side out and I put my apron over so I wouldn't have to breath the dirt; I undressed and went to bed; the nurse went to bed too and we slept together, although I didn't sleep a bit; the nurse slept, but I was afraid there was some kind of a germ, disease or louse or itch or something in the bed . . ."

"I stayed at this place three days. The doctor came out quite late in the evening, and said he would take me to a better place; at that time I was broken out pretty bad and was sick and felt awfully bad and had a high fever. I lay on the bed all the time but did not go to bed because I was afraid to, it was so dirty."

After three days Doctor Wickersham came and took her in the same car that she had been brought to the shanty in, a distance of about fourteen blocks, to a home on another street. She got very cold in the chilly wind which prevailed. The people with whom she was left said they could not keep her, but the doctor went away and left her there where she chilled all the rest of the evening. The people did take care of her, however, although she was for much of the time for several days in a sinking condition. Before her sickness she had been earning fifty dollars a month.

The defendant's version of the affair was that he diagnosed the plaintiff's case as smallpox and told her she would have to be isolated and to get ready as quickly as she could:

"I went back right away and she was ready; she was dressed warmly; I took her out to the pest house in my automobile; it was cold; the top was up but the curtains were not on. . . . She was very patient going out and I jocularly said, 'Well now here is the cemetery right handy if anything happens.' She laughed. When we got to the pesthouse she looked very much awe stricken and displeased. The place was not sanitary; it was very crude. I knew of no other place to segregate people having contagious diseases. . . . At the time I took her to the pesthouse, I told her I would remove her to a better place as soon as one could be obtained. At the time she was removed from the pesthouse she was in the pustular stage. . . . she had secondary fever. The ordinary and usual course of smallpox includes sinking spells; the respiration is diminished; the heart action is weakened; the pulse is more rapid; and the patient is in a condition of lassitude."

Alice Butler testified that she went out to the pesthouse on the evening of the 14th:

"The pesthouse was dirty. The only occupants were a man and the plaintiff. The man was a gentleman and treated us all right. The day I went out, material was sent for a curtain and I sewed it and the man put it up. The day the plaintiff was taken from the pesthouse it was cold. I had been at the pesthouse along in the summer. The beds and pillow cases and blankets and towels were still there when the plaintiff was quarantined. The boards on the walls were wide enough apart that you could put your fingers through. In the summer there was some paper on the walls, but the wind had blown it off. I hung up a blanket or comforter to keep it off.'

The jury returned a verdict in favor of the plaintiff for $1,212.50, and by their answers to special questions said the defendant did not act in good faith; that he was not considerate towards her at all times in removing her from the hotel to the pesthouse and from there to the Smith home; that she suffered unusual inconveniences and that the defendant was negligent towards her; that the negligence consisted of improper conveniences and being confined with a man alone for twelve hours in an unsanitary pesthouse. They allowed her $25 for pain and suffering, $25 for loss of time and $1,162.50 for punitive damages.

The defendant appeals from the judgment, his principal complaint being that the court erred in giving and refusing instructions, in submitting the question of punitive damages, and in denying a new trial, one ground on which it was asked being that the jury reached the verdict by the quotient method. It is also argued that the action was barred by the two-year statute of limitation, and hence the demurrer to the evidence should have been sustained. The injury complained of occurred in February, 1918. On the 20th of the following April the plaintiff sued the city of Independence.

A demurrer was sustained to the petition and an amended petition was filed December 12, 1918, making the city and Doctor Wickersham defendants. A demurrer being sustained to this pleading, a second amended petition was filed July 15, 1919, joining with the city the board of county commissioners and the defendant Wickersham. Both of these pleadings told practically the same story about the conduct of the health officer as was contained in the final petition which was filed September 8, 1920, making E. C. Wickersham the sole defendant. The second amended petition alleged among other things that Wickersham acted under the general direction of the board of county commissioners as the local board of health and also in conjunction with the city commissioners and the city health officer, and charged the defendants with gross and wanton negligence and carelessness. In the third amended petition, the plaintiff alleged the same gross conduct on the part of the defendant and told the same story and alleged carelessness and wanton conduct on his part. Hence, so far as he is concerned, the case had been pending sometime before the two-year statute of limitation had run and the last amended petition did not operate to suspend the statute.

A health officer, while required to obey his lawful orders and perform his official duty, is never excused for wanton conduct and inhumane treatment to patients suffering from serious illness, and it does not militate in the defendant's favor that by amendments the other defendants were eliminated from the case.

It is argued that as the defendant was a quasi-judicial officer he was not responsible in damages for his acts, and it is pointed out that it is the duty of health officers to segregate from the public and to quarantine all persons sick with smallpox, and it is said that in moving the plaintiff from the hotel he was exercising quasi-judicial powers and performing a governmental function. A physician had already pronounced the case smallpox and it took no exercise of judicial power on the part of the health officer to move the patient to a place where guests and occupants of the hotel would be free from danger of infection. Of course, in removing her he was acting in a governmental capacity, but persons who act in that capacity are required to treat other human beings in a reasonably humane and considerate manner. The law, no less than humanity, requires humane and decent treatment of those who must be segregated from their usual conveniences and friends, and whoever acts

with utter disregard of this requirement renders himself liable. (*Murphy v. Fairmount Township,* 89 Kan. 760, 133 Pac. 169; *Hicks v. Davis,* 100 Kan. 4, 163 Pac. 799; Throop on Public Officers, §§ 724-726; *Beers v. Board of Health et al.,* 35 La. Ann. 1132; *Barry v. Smith,* 191 Mass. 78, 87-90; *Beeks v. Dickinson County,* 131 Iowa, 244; 21 Cyc. 405; 12 R. C. L. 1267, § 5.)

It is contended that the evidence was insufficient to establish a cause of action. This suggestion needs no discussion.

Fault is found with the court for certain comments made during the trial, but we find nothing of substance in this complaint.

We have examined the instructions refused and those given and find no error whatever touching these matters.

It is argued that there was no evidence to show that the defendant acted carelessly, wantonly or maliciously, but the jury found otherwise and the evidence warranted the finding.

There was an attempt to show that the verdict was arrived at by the quotient process, but after hearing all the testimony on this point the trial court found nothing wrong with the verdict and we are satisfied with that conclusion.

The judgment is affirmed.