APPLE GROWERS ASSOCIATION v.
KOHLMAN BROS. AND SUGARMAN

(February 13, 1928.  Opinion and Decree.)
(March 26, 1928.  Rehearing Refused.)
(May 8, 1928.  Decree Supreme Court
Writ of Certiorari and Review Refused.)

(*Syllabus by the Court*)

1.  Louisiana Digest—Obligations—Par. 78, 79, 101; Sales—Par. 52.

A shipment from Oregon in December of ripe apples of good quality with no decay and no blemishes conforms to an order for "car extra fancy Ortleys * * * ship this car Omaha cold storage through rate to New Orleans," although a few apples are dead ripe.

2.  Louisiana Digest—Brokers—Par. 8, 9, 12.

A broker is for some purposes treated as the agent of both parties.  But primarily he is deemed merely the agent of the party by whom he is originally employed, and he becomes the agent of the other party only when the bargain or contract is definitely settled as to its terms by the principals.

3.  Louisiana Digest—Brokers—Par. 27; Mandate—Par. 61, 63.

Private instructions by a principal to his agent do not affect third persons dealing with the agent in ignorance of the instructions.

Appeal from Civil District Court.  Hon. M. M. Boatner, Judge.

Action by Apple Growers Association against Kohlman Brothers and Sugarman.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Weiss, Yarrut and Stich, of New Orleans, attorneys for plaintiff, appellant.

Scott E. Beer, of New Orleans, attorney for defendant, appellee.

CLAIBORNE, J.  The plaintiff domiciled in Hood River, Oregon, claims of the defendant the price of apples sold.

It alleged that it received from R. F. Mayer, fruit and produce broker in New Orleans, the following telegram:

"New Orleans, Nov. 15th, 1919.
"Apple Growers Association.
"Hood River, Oregon.
"Book Kohlman car extra fancy Ortleys three dollars.  Want sizes mostly sixty-four and eighty-eights, balance one twenty-fives larger.
"Ship this car Omaha cold storage, Omaha, Nebraska, through rate to New Orleans to apply storage in transit.  Wire number boxes each size before car is shipped.  Answer.
"Signed R. F. Mayer."

The number of boxes and the sizes were wired on November 18 and 756 boxes of apples were shipped on same day in car, Pacific 4821, from Odell, sight draft, bill of lading attached with invoice showing price of apples to be $2268.00; that said car was delivered to and received and unloaded by, the consignee, the Omaha Cold Storage Co. at Omaha; that thereafter on December 12, 1919, plaintiff received from R. F. Mayer the following telegram:

"New Orleans, La., 12 Dec., 1919.
"Apple Growers Assn.,
"Hood River, Oregon.

"Kohlman, Pacific 4821, Omaha Cold Storage unloaded by mistake. Government inspection report reads. Inspected tenth, large sizes, ripe, smaller ripe to firm, no decay, boxes set aside marked by cold storage frozen when unloaded, shows sl'ght browning mushy conditions flesh or deep browning underneath bruise indicating freezing injury.

"Practically no other blemishes. Wanted store now, ship Mexico later. Account condition cannot accept. Make other disposition.
"Signed R. F. Mayer."

To which the plaintiff, the Apple Growers Association, answered on December 13th:

"Apples perfect condition when shipped. Ortleys naturally ripe in December, but this no indication of decay. Last year we shipped Ortleys that showed ripe in December to New York in March. These were sold for shipping point not delivered, consequently cannot assume condition caused by frost. Cannot consider rejection, Pacific 4821.
"Signed C. W. McCullagh."

On December 15, 1919, Mayer wired to plaintiff:

"Blue 13th received Kohlman claims Pacific 4821 ripe when shipped and you knowing same was for storage Omaha had no right to ship this condition. Positively refuses to accept account this condition.
"Signed R. F. Mayer."

To which plaintiff answered on December 16th:

"R. F. Mayer:
"Stock was in perfect condition when shipped, no riper than Ortleys are at this season of year. We handle more Ortleys than all others combined and know positively that their condition when shipped would permit reasonable storage and refreshment later. We are still holding in storage here number cars Ortleys for ourselves and others, and while ripe, we are not alarmed as this variety does not seem to advance in ripeness between now and March first. Treatment Kohlman car received in transit is something over which we have no control and we decline to permit rejection or assume damage by frost. Storage company in unloading acted as Kohlman's agent. To show our fairness will allow quarter box, not because we think Kohlman entitled to anything but to assist in matter. Have him pay draft, drawing him back for allowance.
"Signed C. W. McCullagh."

To which defendant answered on same day:

"Blue 16th received. Kohlman will not accept Pacific 4821 account ripeness. No question price. Bought for storage. Reshipped Mexico later. Cannot reship account ripeness. No demand this variety here. Claim you had no right ship car on account fruit showing ripeness. Storage error unloading car.
"Signed R. F. Mayer."

On December 17th plaintiff wired to Mayer:

"To further show our fairness, if Kohlman wants another car Ortleys shipped as soon as present embargo raised, will ship direct to New Orleans or for storage Omaha, and will take car now Omaha off his hands, provided he agrees pay unloading and loading charges, storage in transit and other charges Omaha storage company. If this not satisfactory will refuse accept rejection, and place matter our attorneys' hands. Always willing do what's right but won't stand for abitrariness. Feel we know considerably more about Ortleys than Omaha inspector and

know positively their condition only natural one for this season year. Advise promptly, Kohlman's decision.
"Signed: Apple Growers Assn."

Mayer answered December 17, 1919:

"Wire received. Kohlman accepts your proposition. Will take another car Ortleys same grade and sizes. Fruit must be firm not showing ripeness. Want store, ship Mexico about 60 days. Shipping instruction by mail. Make other disposition Pacific 4821 not Omaha storage.
"Signed: R. F. Mayer."

The Apple Growers Association answered December 19th:

"R. F. Mayer:
"Answering, Kohlman understands Ortleys especially larger sizes cannot help but show greater maturity than if shipped early.
"These all from cold storage and will show ripeness, but in our opinion from experience covering several years handling larger portion of this variety, are in condition usual this season year. Really believe should be shipped Mexico January. Will do best size but Kohlman understands will not be exactly as other car, but will be Hundred twenty-fives larger."
"Signed: C. W. McCullagh."

R. F. Mayer answered:

"December 23rd.
"Apple Growers Assn.:
"Refer your night letter 19th. On account Ortleys showing ripeness Kohlman's Mexico connection advises will not accept. Afraid fruit will not carry and arrive sound condition. Think advisable cancel this car, unless you will guarantee fruit arrive Mexico sound shape.
"Signed R. F. Mayer."

Apple Growers Assn. wired:

"December 27th.
"R. F. Mayer:
"Your night letter 23rd places matter in different light. Under no circumstances would we have shipped this car at time it was shipped knowing condition Eastern markets. Have been endeavoring make

every effort show our fairness, but we absolutely decline take car now Omaha off Kohlman's hands and take loss ourselves. Either Kohlman accepts car now Omaha or takes another car prompt shipment to replace it as per our last agreement or will sell car at best market for Kohlman's account.
"Perfectly willing submit this matter to any fair minded arbitration. Stock now Omaha not any riper than is usual at time shipped. Advise decision immediately.
"Signed: Apple Growers Assn."

Mayer answered December 29, 1919:

"Kohlman states positively will not accept another car Ortleys on account ripeness as this car will have to be shipped Mexico later. Cannot store on account ripeness. Use your own judgment handling this deal.
"Signed: R. F. Mayer."

Apple Growers Assn. wired December 30th:

"R. F. Mayer:
"Again referring Kohlman's Ortleys. In your night letter November 15th nothing was said about reshipment to Mexico, but that through rate to New Orleans would apply, storage in transit car was shipped November 18th but you did not wire until December 12th reporting that car was unloaded and inspection made. We dislike extremely to resort to legal measures to adjust matter. This is final notice that matter will be placed with Produce Reporter Co. unless Kohlman decides to be fair. Please advise if wires you have sent are your own decision or Kohlman's instructions.
"Signed: Apple Growers Assn."

R. F. Mayer answered December 31st:

"Apple Growers Assn:
"Night letter 30th received. Kohlman states wants be fair but on account of fruit showing ripeness could not accept another car Ortleys on account apples having to be shipped Mexico next 60 days. This is their final decision. Wishing you a happy and prosperous new year.
"Signed: R. F. Mayer."

Thereupon the plaintiff caused the apples to be sold at auction. The sale realized $1855.20 or a difference of only $413.30 from the original price of sale.

The freight amounted to ................$579.07
Auction charges ....................................  4.50
The commission ...................... ............ 92.76

Making a total of...........................$676.33
leaving a balance of $1178.87.

The defendant answered that R. F. Mayer was the agent of the plaintiff and as such effect the sale to the defendant. "F. O. B., Hood River, Oregon:" That the telegrams above passed between plaintiff and Mayer and are outside of their knowledge; that the plaintiff did not ship the apples ordered by defendants but shipped apples which were in a ripe condition; that the order called for apples for cold storage at Omaha; that ripe apples are not the kind to be shipped for storage; and that the car was unloaded by the Omaha Cold Storage Co. contrary to instructions. The defendants further alleged that they had sold the apples at a profit of 30 cents a box, or $226.80, which they claim in reconvention from plaintiff.

There was judgment rejecting the demands of both the plaintiff and the defendant.

The plaintiff has appealed.

There are only two questions to be passed on by the court. The first is, whose agent was R. F. Mayer, in this transaction, and the second, did the apples shipped by plaintiff fail to comply with the order given to it.

The plaintiff has nothing to do with the unloading of the apples at Omaha, as it did not give orders so to do. The apples were consigned according to order to "Omaha Cold Storage," and were delivered to the carrier f. o. b. Plaintiff's duties ended there, and cannot be charged with what was thereafter done by other parties without their instructions.

The learned trial judge based his judgment upon the assumption that R. F. Mayer was "representative" or agent of the plaintiff. We cannot agree with him. Mayer was a "broker" by occupation, doing business in New Orleans. He explained his connection with this sale in the following manner:

"Q. Mr. Mayer, how did you start in effecting this transaction?
"A. It is customary for the brokers to go around daily and call on their trade and inquire if they want anything. About that time, Kohlman Bros. and Sugarman informed me that they wanted a car of apples of this variety. After they told me what they wanted, I wired my connection to the Apple Growers' Association.
"Q. What do you mean by your connection?
"A. I represented them as their agent here."

It thus appears that Mayer was a "broker," that the defendants employed him to procure for them a car of apples, that Mayer was the "broker" of the plaintiff also, and that he transmitted to it the order for the apples. The law in such a case is that:

"A broker is for some purposes treated as the agent of both parties. But primarily he is deemed merely the agent of the party by whom he is originally employed; and he becomes the agent of the other party, only when the bargain or contract is definitively settled, as to its terms between the principals." Story on Agency, S. 31 Woods, Slayback & Co. vs. Rocchi, 32 La. Ann. 210; C. C. 3017; So. Cotton Oil Co. vs. Shreveport Cotton Oil Co., 111 La. 393, 35 So. 610; 19 Cyc. 191; Pfeiffer & Co. vs. Mayer & Co., 3 La. App. 289.

"Primarily a broker employed to do a particular thing is the agent of the party who first employs him, and he cannot with-

out the full and free consent of both parties be the agent of both throughout the transaction; but in so far as he acts strictly as a middleman to bring the parties together or to execute the contract after the parties have agreed on the terms, such as to effect a purchase or sale of property, he is the common agent of both parties." 9 C. J. 518 S. 20.

In the case of Rocchi vs. Schwabacher, 33 A. 136, the plaintiff negotiated with the broker, Schexnaider, for the purchase of a quantity of lard from Schwabacher. The lard was later found to be of such inferior quality as to be unfit for cooking purposes. Rocchi sued for return of part of the purchase price paid to him.

The Court said:

"* * * The record shows conclusively to our minds that on these purchases he (Schexnaider) was the duly accredited broker or agent of plaintiff, who is therefore bound by the acts of Schexnaider in the premises."

The repeated correspondence, which we have reproduced hereinabove, shows that the Apple Growers Association was acting for itself throughout in the transaction.

All the wires were signed by its manager. While the other party, Kohlman Brothers, appear nowhere, eo nomine; all the wires are addressed to "R. F. Mayer," and all are answered by R. F. Mayer, not in the name of the defendants but individually. The defendants' name appears nowhere in the body of the wires.

Mayer did not cease to be a broker because he represented the plaintiff in New Orleans in seeking a purchaser for his apples. He did not thereby become the agent of the plaintiff, in the sense in which the word is usually employed.

He had no general power to sell plaintiff's apples. His only authority was to secure a purchaser. Mayer served as a witness for the defendants and testified in their favor.

"An agent is one who represents a principal to the exclusion of all others with full powers. A broker sells his services to any one who chooses to employ him to procure a seller or a purchaser." 9 C. J. 510 S. 10.

C. N. McCullagh, sales manager for the plaintiff, testified that the order (for the apples) was received through R. F. Mayer, a broker in New Orleans, who represented the association as a broker, and in the sale of fruit, acted as agent of the purchasers as well as (of) the association.

It therefore follows that the only contract made by plaintiff with defendants was that made when plaintiff accepted the order dated November 15th reading: "Book Kohlman car extra fancy Ortleys, $3 want sizes mostly 64 and 88, balance 125 larger. Ship this car Omaha Cold Storage, Omaha, Nebraska, through rate to New Orleans to apply storage in transit."

But B. F. Mayer testifies:

"When I received this order from defendants, they informed me that this particular car was to be sent to the Omaha Cold Storage Company and then reshipped later to Mexico."

There is no evidence that this information was communicated to the plaintiff.

"Secret or private instructions or limitations in the general authority of an agent, however binding they may be as between the principal and his agent, can have no effect on a third person who deals with the agent in good faith, in ignorance of the instructions or limitations and in reliance on the apparent authority with which the principal has clothed him." 2 C. J. 566; Farrar vs. Duncan, 29 A. 126; Chaffe vs. Barataria Canning Co., 113 La. 215, 36 So. 943 (229).

The wires reproduced above demonstate not only that Mayer was employed by the defendants as their representative for the purchase of the apples, but they also indicate the reasons advanced by the defendants for refusing to accept the car of apples. They are three in number: 1st. that the apples were "ripe"; 2nd. that they were to be kept in cold storage to be shipped to Mexico, and 3rd. that their condition of maturity was such that they could not stand the trip there.

As to the maturity of the apples:

C. W. McCullagh, sales manager for the plaintiff from April, 1917, to April, 1921, but now no longer in their employ, had personal knowledge of the order of defendants for apples dated November 15, 1919; he did not see the apples shipped but he saw apples taken from the same cold storage rooms between the time of this shipment and January 1, 1920, and they were in excellent condition; apple grades are established by the Legislature of Oregon, and an "extra fancy apple" is defined as mature free from bruises, etc.; this would describe an "extra fancy Ortley," these apples are harvested in October or early in November; the larger sizes are more mature in November than the smaller sizes; the Ortley apple maintains its life well into March and April of the following season; although showing a ripening condition in November, this apple is frequently held and sold to advantage as late as the following March; the apples shipped were mature and while the very large sizes were inclined to ripeness, they were not dead ripe, but were fit for reasonable storage of from 30 to 60 days after arrival and reshipment from New Orleans, the point for which they were purchased; the condition of the apples was such as to make them fit for the purpose sold and intended; the plaintiff handles from a million to a million and a half boxes yearly; in November large size Ortley apples incline slightly to ripeness, small sizes from firm to hard green; extra fancy Ortley apples of the sizes specified in the order could not have been procured less ripe than those shipped; the size of the apple indicates the number of apples in the box, size 88 means 88 apples in the box, all boxes being of the same standard size; when cold storage is provided in a contract the condition of the apple to be shipped depends upon the variety; Ortleys may be ripe but would still be crisp and while ready for fairly prompt consumption; would be fit for a reasonable storage life of from 30 to 60 days, and still be fit for movement to such markets as New Orleans; an apple will ripen, but refrigeration retards the ripeness to a certain extent, it does not wholly stop it, a contract calling for apples for storage is properly filled by the shipment of such apples as were shipped in the carload in question; handling of large size apples is bound to bruise some to a certain extent; it would have been impossible to have selected similar sizes of apples that were any more firm or showed less ripeness, than the stock in question; the witness has had many years of experience in the shipping business and had the apples in question been in such a condition as not to hold a reasonable time in storage, he would have declined the order.

Wm. Metcalf, resided in Hood River, Oregon; is warehouse foreman of Kelly Brothers; in November, 1919, he was employed by the plaintiff association; he was inspector for six years from 1914 to 1920; he has packed and inspected lots of apples for ten years; he has no recollection of the particular car in question but all the inspections at that time were made by him; the apples of that year were mature

and well colored; he made the inspection for the plaintiff; the apples were mature, too hard for immediate consumption and in firm condition for storage; the term "hard" means mature, too hard for immediate consumption, but prime condition for storage; that is the usual condition of apples shipped in November, apples less ripe than those shipped could not have been procured to fill the order; there are two inspections of apples, one by the local inspector when they arrive at the warehouse, and the other when they are loaded into the cars; apples to be shipped for cold storage and for reshipment should be mature, but not showing any degree of ripeness; they should be ripe but not overripe for the purpose; if apples arrive ripe, it is not conclusive that they were shipped ripe; it would depend upon the length of transit, temperature and refrigeration; the apples could not have been ripe at that time of the year; they were mature but not ripe; it would have been positively out of the question to have shipped apples at that time of the year from that section otherwise than fit for storage.

The defendants, on their behalf, examined the following named witnesses:

R. F. Mayer testified that he is a broker, and not a commission merchant; that he did not claim to be an expert in the apple business; though he had been in the produce trade for 30 years; when apples are purchased in Oregon and are shipped cold storage in transit in the opinion of the trade, the apples should be prime apples and not ripe, and he would reject the consignment; the car was shipped on November 18, 1919, arrived in Omaha on December 1st, unloaded there and put in cold storage on same day by the Omaha Cold Storage Company, and on December 10th the car was inspected by a government inspector; the trade as a rule abides by the government inspec-

tion, he did not think it was necessary to inform plaintiff that the defendants intended to ship the apples to Mexico, because it had no bearing upon the quality to be shipped; apples are bought in season and put in storage and kept for four or six months and sometimes for a year; he knows nothing of the condition of apples shipped from Omaha; the plaintiff is supposed to be one of the best shippers in the country; the Ortley apple is of the yellow variety; this market usually buys only the red variety; when a car is intended for long storage the apple is put in the car green; his objection to the apples was based on the report of the government inspector; he did not notify the plaintiff that the apples were intended for immediate consumption or for export six months later to Mexico, a warm climate, because it would have no bearing upon the condition of the apples to be shipped, it would be the same; the real reason for refusing the apples was because they were too ripe for shipment to Mexico; it is a bad bargain to buy Ortley apples for this market as there are perhaps not more than two cars sold here in a season.

S. J. Drapekin testified that 12 days refrigeration will not ripen fruit; he is manager of a cold storage company; refrigeration in winter keeps the apple in its natural condition; keeps it from freezing; if the weather is cold enough the apples may freeze in transit; apples stored in transit are sometimes shipped the next day, or six months or a year later, at the salesman's option; shipment from Oregon to New Orleans stored in transit at Omaha through rates to New Orleans means that the apples are stored in Omaha and afterwards shipped to New Orleans and the original rate from Oregon to New Orleans would apply, plus the transit charges in Omaha; but they would have to complete the trip to New Orleans in order to get the

through rate to New Orleans; it means that the apples are destined by the shipper for New Orleans.

John Meyer has been in the fruit business for 30 years; he is not an expert regarding apple conditions, but he has a fair knowledge of them; he practically corroborates Mayer as to the conditions of apples shipped from Oregon and stored at Omaha, and the effect of refrigeration; the government inspector's report is usually adopted to back your own inspection; Ortley apples are usually sold here for consumption; if intended for Mexico they should be green; if apples were only ripe but not dead ripe they could remain in cold storage several months; Ortley apples ripen in refrigeration; they would do so in the course of three weeks, because they are a tender soft apple, they would not if green; storage in transit means that you have the privilege of storing that car in another state and the privilege of reloading that car and turn it to its final destination, say New Orleans with a small additional charge; that shipment is understood to be destined to New Orleans, though he might divert it to Mexico; if apples are bought in the regular course of the season they are not supposed to be green; an order for a car of extra fancy Ortleys mostly 64 to 120 would mean merchantable apples in good, firm, sound condition and not green to mature; if the apples had been ripe, but not dead ripe, they could have been sold in New Orleans.

Joseph Chalona, also a wholesale fruit dealer, testified that if apples are shipped on November 18th from Oregon and arrive in Omaha on December 1st and are there and then inspected, they should not change if there was not a defective equipment and the car was properly refrigerated; it is customary to comply with the government inspector's report; if apples were improperly refrigerated they would mature and deteriorate and show decay; if apples were shipped from Oregon in November and arrived in New Orleans 30 days after, in a ripe condition they could be sold, provided they were not dead ripe and they were extra fancy in grade; it would be the same if they could stand storage for 2 or 3 months; according to the inspector's report they could not stand storage for that length of time because it shows they were ripe, and dead ripe and unfit for storage; the Ortley apple is not our longest keeping apple, it is a fairly good keeping apple but does not compare with some of the other varieties.

Charles Sugarman, one of the defendants, testified that his firm had been dealing in apples in New Orleans for 28 years; when they received from Mr. Galinsky, who was inspecting apples for them, that the apples showed ripeness he instructed him to have the apples inspected by the government inspector; and after they received the latter's report they notified the shipper's agent here that on account of the ripeness of the fruit they could not accept them; he bought these apples for shipment to a customer in Mexico, whose order he showed Mr. Mayer; the Omaha refrigerator people said they would not inspect apples because they knew nothing about them as far as quality and freeze were concerned; their order called for a firm, crisp matured apple; the Ortley apple is usually bought in October or November and is kept until spring.

The government inspector's report dated December 10, 1919, reads as follows:

"Color and maturity:
"Color ranges from bright yellow to greenish, sizes 100 and larger mostly ripe, few dead ripe, beginning to mellow; sizes smaller than 100 ripe to firm. Decay none apparent. About 1/3 of load set to one side and marked 'frozen' by Omaha Cold Storage Warehouse shows slight brownish or mushy condition of flesh or deep brown-

ing underneath bruises (outside skin of bruise tough and leathery bearing resemblances of having been frozen. This condition usually confined to apples touching one side or end of box, extending mostly one or two layers of apples into box. Boxes in balance stock shows little or no indications of freezing injury. Practically no other blemishes noted. Remarks: Stock apparently free from decay and is of good quality. As noted above sizes 100 and larger ripe to few dead ripe and smaller sizes ripe to firm. Stated by Omaha Cold Storage that lot inspected removed from car P. F. E. 4821 and placed in their storage warehouse on December 1, 1919."

The defendants' inspector, "Gilinski'" at Omaha, reported as follows:

"Car partly frozen apples thawed out condition ripe apples throughout boxes, packed good would not advise for long keeping, small apples firm."

The defense is based entirely upon the reports of the two inspectors, one for the defendants themselves and the other for the government. They both report that the apples· were partly frozen and thawed. The apples were sold f. o. b., Hood River.

The testimony of plaintiff's two witnesses establishes that at the date of delivery to the carrier the apples were in good condition. The purchasers assumed all the risks of transportation and cannot hold the plaintiff liable if the apples froze owing to the weather or during the possession of the carrier.

As to the other parts of the reports, the worse that can be said of them is that the apples were "mostly ripe, few dead ripe, beginning to mellow; no decay apparent, no other blemishes noted; stock of good quality". It must be noted that outside of these experts no single witness for the defendants saw the apples. Their testimony is based exclusively upon the

two reports of the experts. Neither did the trial judge hear plaintiff's witnesses.

In our appreciation of the testimony there is nothing in their testimony sufficient to defeat plaintiff's claim. The order of defendants is contained in the wire dated November 15th. It reads in part as follows: Book Kohlman car extra fancy Ortleys three dollars. Want sizes mostly 64 and 88 balance 125 larger, etc."

There is no complaint that the plaintiff did not ship "extra fancy Ortleys". The complaint is that the apples were ripe or too ripe, while the order implied green apples. The only testimony that the apples were ripe is that of the two inspectors. The mature condition of the apples might have existed at Omaha at the time of the inspection brought about by the freeze and other possible causes. Or the inspectors may have had a different appreciation of the meaning of the words "ripe" or "mature." The plaintiff testified that the Legislature of Oregon had defined the meaning of an "extra fancy' apple" as one matured, clean, smooth, hand picked, well formed.

Plaintiff testified that he .had delivered such an apple. The inspector of his company corroborated this testimony. The order did not define the qualities required in the order given. The condition of the apples at Omaha might have been quite different from their condition when delivered to the carrier, 22 days before, owing to the freeze. The defendants resist on the ground that the order for storage indicated that they were there to remain for a long time. It is strange that the apples should have to remain a long time in Omaha if they were sold to Mexico as defendant testifies.

The plaintiff testified that they could have remained in cold storage for 30 or

60 days or perhaps for a longer time, and the evidence is that refrigeration arrests maturity. The evidence is also that those apples in the condition they were in according to the report of the inspectors would have found a ready market in New Orleans. The evidence also is that according to the terms of the routing "Omaha—New Orleans"—one would have understood that the apples were to be shipped to New Orleans on leaving Omaha even although the owner might have diverted them elsewhere. The testimony of Mayer is influenced by his relations to the defendants. The testimony of Meyer, and of Chalona is that of witnesses in the same line of business and is not entitled to greater weight than that of the defendants themselves. 1 H. D. 559 No. 14; Howe vs. Manning's Executor, 13 La. 413; Beers vs. Board of Health, 35 La. Ann. 1132; Hart vs. Dreyfous, 42 La. Ann. 631, 7 So. 781; Succession of McNamara, 48 La. Ann. 45, 18 So. 908.

There is no evidence that the plaintiff knew of the customs they speak of.

They say that according to the inspectors' reports the defendants were justified in refusing to accept the apples. But the case must not be decided upon these reports alone. The whole evidence must be considered and the case decided accordingly. According to that light we are of the opinion that the defendants were not justified in refusing to accept the apples.

If they wanted green apples they should have ordered them such; if they wanted them for shipment to Mexico they should have so stated.

. The burden was upon the defendants to prove their defense, and they have failed.

The fact that a few of the apples were 'dead ripe did not certainly justify the rejection of 756 boxes.

The evidence is overwhelming that fruit does not mature appreciably in refrigeration and that it will keep in the same condition of maturity for 30 or 60 days. Therefore the apples delivered by plaintiff to the carrier would have kept ripe and not overripe for that length of time and for shipment to New Orleans and even Mexico or elsewhere.

It is therefore ordered that the judgment herein be reversed and set aside; and it is now ordered that the defendants, Kohlman Brothers and Sugarman and Sigmund Kohlman and Charles Sugarman, be condemned in solido to pay to the plaintiff, the Apple Growers' Association, the sum of one thousand and eighty-nine 13-100 dollars with five per cent per annum interest from November 18, 1919, till paid and all costs of suit.